**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH V. CAPODICI, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: 03-cv-2306 (JLL) |
| ) | |
| v. ) | |
| ) | **OPINION** |
| ) | |
| CITY OF JERSEY CITY, et al., ) | |
| ) | |
| Defendants. ) | |

**LINARES**, District Judge.

      This matter comes before this Court on the motion for summary judgment of Defendants, the City of Jersey City ("JC"), City of Jersey City Police Department ("JCPD"), and the police department's named employees, patrol officer Vincent J. Constanza ("Constanza"), patrol officer John Bacigalupo ("Bacigalupo"), Lieutenant Datina Rinn ("Lt. Rinn"), patrol sergeant James Sullivan ("Sgt. Sullivan"), Jane and John Does 1-20 and XYX Corp. 1-20 (hereinafter, collectively "Defendants"), pursuant to Fed. R. Civ. P. 56(c). Plaintiff Joseph V. Capodici ("Plaintiff") commenced this action against Defendants alleging, inter alia, violations of his civil rights, false arrest, and false imprisonment. The Court has considered the submissions in support of and in opposition to this motion. For the reasons set forth below, Defendants' motion is DENIED in part, and GRANTED in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

      For purposes of the instant motion, the relevant facts are as follows. This action stems from an incident that took place on May 18, 2001. On that date, Plaintiff was arrested by

officers Constanza and Bacigalupo pursuant to an arrest warrant issued by Lt. Rinn. The warrant was based on a complaint made on May 18, 2001 by Plaintiff's landlord, Virginia Guadagnino ("Landlord"), alleging that Plaintiff made terroristic threats against Landlord and her property.

Prior to May 18, 2001, Plaintiff and Landlord were engaged in an ongoing landlord-tenant dispute.  Plaintiff was residing in a portion of Landlord's home located at 152 Bentley Avenue in Jersey City, New Jersey.  On April 24, 2001, Landlord allegedly entered Plaintiff's premises without Plaintiff's permission.  As a result, Plaintiff called police.  Landlord told the responding officers that she wanted him out.  Landlord was advised by the officers that in order to have Plaintiff removed from the premises, she would need to use the court eviction process. She was further advised to stop harassing Plaintiff and was told not to enter Plaintiff's apartment without his permission.

On May 11, 2001, Landlord allegedly unlawfully locked Plaintiff out of the premises and caused some of Plaintiff's personal property to be removed.  In response, Plaintiff filed an Unlawful Detainer Complaint in the Hudson County Special Civil Part of the Superior Court of New Jersey.  The Hon. John A. O'Shaughnessy, J.S.C. heard the matter that day and issued an Order to Show Cause that was returnable on May 18, 2001.  The Order required that Landlord give immediate possession of the premises to Plaintiff and replace all of Plaintiff's personal property.

At some point on May 11, 2001, Sgt. Sullivan went to the premises and spoke with Plaintiff and Landlord.  The timing of the visit and what occurred during said visit are not clear.[1] No evidence has been provided to show that on that date, or at any date prior to that, that Landlord communicated to police that Plaintiff had made threats to her.  Police treated the

---

[1]      In Sgt. Sullivan's deposition, he states that he cannot remember when he went out to the property, but in any case that it was uneventful.  (Defs.' Ex.3T at 19, 20, 23, 31).

dispute between Landlord and Plaintiff, through May 11, 2001, as a landlord-tenant dispute that was purely civil in nature.  (Defs.' Ex.4T at 29:25-30:3).

On May 17, 2001, Plaintiff called the Jersey City Fire Department and reported that combustibles, owned by Landlord, were being kept on the premises.  On May 18, 2001, a fire inspector came to the premises, finding "excessive storage of combustibles" and giving Landlord three days to abate.  (Defs.' Ex.JA-JZ).[2]

On May 18, 2001, Plaintiff, Landlord, and Landlord's daughter appeared before Judge O'Shaughnessy for the show cause hearing.  Judge O'Shaughnessy's prior order allowing Plaintiff to remain on the premises was upheld.  There is no indication that Landlord informed Judge O'Shaughnessy of any prior threats made by Plaintiff against her and her property. Immediately after leaving the hearing, Landlord and her daughter went to the police station and alleged that as they were leaving the courthouse Plaintiff verbally threatened to blow up Landlord's house that night.  (Defs.' Ex.4T at 66:23-67:7).

At the station, Landlord and her daughter were interviewed by Lt. Rinn.  According to Lt. Rinn, they appeared to be terrified, and were teary-eyed and shaking.  (Id. at 79:22).  During the meeting, Lt. Rinn did not administer an oath to Landlord.  After the interview, Lt. Rinn sent Landlord and her daughter to Detective Charlene Hilliard to give a statement.  Lt. Rinn determined that probable cause existed to issue a warrant for Plaintiff's arrest for the crime of making terroristic threats.  (Id. at 79-81).  Thereafter, Lt. Rinn spoke with Sgt. Sullivan and instructed him to phone an on-call judge.  The record is not clear, however, on whether Sgt. Sullivan was told to call a judge for advice or to authorize the issuance of a warrant.  Prior to the

---

[2]      Defendants have failed to specifically identify the various documents included within this exhibit.  Therefore, the Court will have to refer to any documents contained therein as "Ex.JA-JZ."

call, Sgt. Sullivan had only spoken with Landlord at the precinct that day "in passing."  (Defs.'

Ex.3T at 38:11-13).

    Once on the call, the Hon. Dennis McGill, P.J.M.C. did not place Sgt. Sullivan under

oath.  The call was recorded, and excerpts from a transcript of the call follow:

| | |
|---|---|
| SERGEANT SULLIVAN: | Okay.  We have a - - I Don't know.  You're going to have to advise me.  I'll fill you in.  Last week  ... it was like a tenant landlord dispute and -- |
| JUDGE MCGILL: | Tenant landlord? |
| SERGEANT SULLIVAN: | Yeah , tenant landlord dispute.  And both parties advised the court – I was there.  That's why I am filling you in on it.  [Plaintiff] objected because he was put out and there was no eviction procedure  ... the [landlord and daughter] seem very nice, et cetera.  He seems like he's a little deranged . ... I told him, "Go to court.  You people go to court.  Get a restraining order."  Well, he went to court and he got a court order .... |
| JUDGE MCGILL: | Uh-huh. |
| SERGEANT SULLIVAN: | Allowing him back in. So naturally we effected the court order and put him back in and told them to go try to get a superceding court order or address that court order.  They went today and [the order] was upheld ... after hearing both sides.  As he walked out of court and this was true to form .... |

(Defs.' Ex.1T at 2:20-3:25).

*      *      *

| | |
|---|---|
| SERGEANT SULLIVAN: | He turned to [landlord and daughter] and said 'Now – now, that will be the last time you did that because I am going to blow up your house tonight.' ... [N]ow their talking to my lieutenant, and the only reason I'm calling you is because I was there, she wasn't, and she's authorized a report for terroristic threats. |

| | |
|---|---|
| JUDGE MCGILL: | Well, that's what I was going to suggest allowing a warrant to be signed by the complainant -- |
| SERGEANT SULLIVAN: | Which is being done, and an arrest, if necessary, but she's also asking for a restraining order, and I wanted to give you all the specifics .... |

(Defs.' Ex.1T at 4:9-25).

\*           \*           \*

| | |
|---|---|
| JUDGE MCGILL: | Yeah, certainly they have a right to charge the fellow with terroristic threats or whoever it is that made the statement. |
| SERGEANT SULLIVAN: | Right. |
| JUDGE MCGILL: | And, you know, under the rules generally it would be done by summons unless there's some specific information indicating the party had, you know - -  is a danger to himself and others. |
| SERGEANT SULLIVAN: | Well, I've been there, and I believe he is and I relayed that to my boss, the lieutenant, and the officers were going to type up a warrant, and if we ran across him tonight or had a problem with him tonight, we were going to make -- |
| JUDGE MCGILL: | Arrest him. |

(Defs.' Ex.1T at 5:15-6:6).

\*           \*           \*

| | |
|---|---|
| JUDGE MCGILL: | Go with the terroristic threats by a CDR . . . |
| SERGEANT SULLIVAN: | Yes, ....  We call it a warrant or summons, right, so go with the warrant. |
| JUDGE MCGILL: | Okay. |
| SERGEANT SULLIVAN: | That's fair enough, and at least we talked to a judge about it.  I just didn't want you to think we were going in the back door to supercede Judge O'Shaughnessy. |
| JUDGE MCGILL: | No, no, no, I understand  .... |

(Defs.' Ex.1T at 6:16-7:3).

\*           \*           \*

| | |
|---|---|
| SERGEANT SULLIVAN: | All right.  I wanted to talk to you anyway on the phone, just in case, you know this does come back.  I didn't want you getting in trouble with O'Shaughnessy or  - - you know what I mean, Judge? |
| JUDGE MCGILL: | I'm not worried about O'Shaughnessy, and you can always say you talked to me to cover your own ass. Okay? |
| SERGEANT SULLIVAN: | Yes, sir.  Have a nice weekend .... |
| JUDGE MCGILL: | All right, bye. |
| SERGEANT SULLIVAN: | Take care. |

(Defs.' Ex.1T at 7:11-22).

After the call with Judge McGill, Lt. Rinn states that Sgt. Sullivan relayed to her that Judge McGill had verbally affirmed that there was probable cause to issue an arrest warrant. (Defs.' Ex.4T at 77:10-22).  Once Landlord completed her statement, Lt. Rinn issued a warrant for the arrest of Plaintiff based on Landlord's allegation that Plaintiff threatened to kill her on seven separate occasions and threatened to blow up her home on four occasions.  Lt. Rinn did not prepare the warrant, but she did sign it.  Landlord also signed the warrant.  The warrant states that Landlord gave the information for the warrant "[u]pon oath," and Lt. Rinn's signature appears as the person administering the oath.  (Defs.' Ex. 4T at 7).

As issued, the warrant did not indicate the name of any judicial officer that found probable cause or the date and time of that finding; nor did it contain the name of the officer on whose testimony the judicial officer based his decision.  (Defs.' Ex.JA-JZ).  Judge McGill's name does not appear on any of the paperwork prepared the evening of May 18, 2001.  In addition, the warrant states, under the wording commanding any peace officer or other authorized person to arrest Plaintiff, that it was issued on May 21, 2005.  Further, it is unclear whether the word "is" (as in probable cause is or is not found) was circled when issued on May 18, 2001, or subsequently circled when signed by a judicial officer on May 21, 2001.

After the warrant was issued but before Plaintiff was arrested, Landlord returned home. Later that evening, Landlord notified Lt. Rinn of Plaintiff's presence at his home, and Lt. Rinn sent officers Constanza and Bacigalupo to arrest Plaintiff.  Plaintiff spent approximately thirteen hours in jail before being released on bail.

On May 21, 2001, Plaintiff's warrant was reviewed by Assistant Prosecutor Edward Winslow who found probable cause for the issuance of the complaint, but the charges were amended to harassment.  The charges against Plaintiff were subsequently dismissed.

On May 25, 2001, Lt. Rinn completed a continuation report related to the May 18, 2001 incident.  (Defs.' Ex.JA-JZ).  Lt. Rinn had been contacted by internal affairs due to inconsistencies in the report.  Lt. Rinn was instructed that the report should state, "Judge McGill then directed a warrant for terroristic threats be issued for the actor and be signed for by Lieutenant Rinn."  (Id.).

On June 26, 1995, the Assignment Judge of the Superior Court of Hudson County issued a memorandum reiterating some basic requirements for issuing arrest warrants.  (Defs.' Ex.JA-JZ).  The memo was issued due to the fact that "numerous defendants" were reaching CJP courts without having probable cause properly determined.  In part, this memo required that all arrest warrants authorized telephonically state that "Probable cause is (is not) not found for the issuance of this Complaint" and include the name of a judge or judicial officer.  (Id.).

Plaintiff commenced the instant action on or about May 16, 2003.  Defendants presently move before this Court for summary judgment on all claims asserted by Plaintiff.[3]  Defendants maintain that summary judgment is proper because Plaintiff has not asserted any deprivation of

---

[3]     Oral argument was heard on December 22, 2004.

his civil rights by Defendants, and even if such violations occurred, Defendants are immune from liability.

## LEGAL DISCUSSION

**A.      Summary Judgment Standard**

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©); Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).  "A 'genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the movant's favor with regard to that issue."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  When considering a motion for summary judgment, all evidence must be reviewed and all inferences drawn therefrom must be in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 256.  "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  Id. at 252.  Furthermore, conclusory statements and arguments do not raise triable issues which preclude summary judgment.  Ridgewood Board of Educ. v. N.E., 172 F.3d 238, 252 (3d Cir. 1999).  Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 257 (citation omitted).  If the opponent fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of

proof at trial, all other facts are necessarily immaterial and summary judgment must be granted.

Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986).

The present task is to determine whether genuine issues of material fact exist and whether Defendants are entitled to judgment as a matter of law.

**B.      Liability for Superior and Patrol Officers**

There are certain requirements for establishing a constitutional claim under 42 U.S.C. § 1983.  Section 1983 reads, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not create substantive rights; instead, "it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To recover under § 1983, a plaintiff must prove that defendants, acting under color of law, engaged in conduct that deprived him of his constitutional rights.  Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000); Berg v. Allegheny, 219 F.3d 261 (3d 2000); Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  In this matter, it is not contested that defendants were acting under color of law when they issued and executed the warrant for Plaintiff's arrest.  Accordingly, the court must next "identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998).  Plaintiff claims that his arrest on May 18, 2001 was in violation of his right under the Fourth Amendment to the United States Constitution.  (Compl. ¶26).  The Fourth Amendment "prohibits a police officer from arresting a citizen except upon probable cause."

Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995) (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 169 (1972)).

### 1.     Probable Cause

Probable cause exists where the "facts and circumstances [are] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Sharrar v. Felsing, 128 F.3d 810, 817-18 (3d Cir. 1997) (citing Gerstein v. Pugh, 420 U.S. 103, 111 (1975). As noted by the Circuit, a court must evaluate the "totality of the circumstances" in ascertaining whether there is probable cause.  Sharrar, 128 F.3d at 818; United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984) (citation omitted).  Further, probable cause does not require the officer to investigate every lead or that the officer obtain proof beyond a reasonable doubt. Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 251 (3d Cir. 2001).  In § 1983 actions, the question of probable cause is one for the jury only upon sufficient evidence whereby a jury could reasonably conclude that the police officers did not have probable cause to arrest. Sharrar, 128 F.3d at 818 (citing Deary v. Three Un-Named Police Officers, 746 F.2d 185, 190 (3d Cir. 1984)).

Turning to the facts at bar, Defendants urge that based on Lt. Rinn's observations on May 18, 2001 of Landlord's demeanor, as well as the statements made to Lt. Rinn, she reasonably believed that there was probable cause to arrest Plaintiff.  The facts reveal that on May 18, 2001, after the hearing before Judge O'Shaughnessy, Landlord and her daughter went to the police station to report that Plaintiff had made threats against Landlord and her property.  According to Lt. Rinn, Landlord and her daughter appeared to be terrified and visibly shaken.  Lt. Rinn further testified that Landlord stated that Plaintiff "was going to kill her" and that he had "the ability to burn down the house."  (Defs.' Ex.4T at 68:24-69:2).  Lt. Rinn stated that soon thereafter, she

made a probable cause determination, and sought to obtain a warrant for terroristic threats.  On

this point, Lt. Rinn testified as follows:

| | |
|---|---|
| MR. OPPICI: | And then based upon Mr. Capodici's demeanor, physical demeanor, and what he said to Sergeant Sullivan, and correct me if I'm wrong, Ms. Guadagnino's statements to you and then Detective Hilliard's interview, you then advise or make a determination that Judge McGill should be contacted for determination as to whether there is probable cause to this issue for warrant on the complaint? |
| LT. RINN: | Yes. |

(Defs.' Ex.4T at 74:9-18).  Notably, however, Lt. Rinn did not ask Landlord if she was there

because she had lost the hearing that day, or ask whether Landlord had informed Judge

O'Shaughnessy of prior threats, or ask why, if threats had been made on numerous previous

occasions, Landlord had not informed police officers of the threat on their many prior visits to

her house involving the dispute between Landlord and Plaintiff.  Lt. Rinn also stated that it never

crossed her mind that Landlord may be lying.  (Defs.' Ex.4T at 6, 9-10, 42-43, 81).

Additionally, the officers who had previously responded to Landlord's house worked for Lt.

Rinn, and apparently reported to Lt. Rinn afterwards.  (Id. at 27:22-28:15).  On the record thus

far developed, genuine issues of fact are clearly present concerning Landlord's credibility given

the outcome of the hearing that day, as well as the history of prior incidents involving Landlord

and Plaintiff.  To be sure, summary judgment on the issue of whether there was probable cause

to make an arrest is appropriate "where no genuine issue as to any material fact exists and where

credibility conflicts are absent ...."  Deary, 746 F.2d at 192.  Such is not the case here.

Accordingly, Defendants' motion shall be denied to the extent they seek summary judgment on

the issue of whether there was probable cause to charge Plaintiff.

2.        **Arrest Warrant**

Plaintiff contends that assuming arguendo, probable cause existed to seek the arrest

warrant, his arrest was illegal because the issuance of the arrest warrant was improper.  The

Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported

by Oath or affirmation ...."  U.S. Const., Amend. IV.  This requirement applies equally to arrest

warrants as well as search warrants.  Giordenello v. United States, 357 U.S. 480, 485-486

(1958).  Here, Plaintiff's arrest occurred inside his home.  Therefore, the police were required to

obtain an arrest warrant, unless exigent circumstances justified a warrantless arrest.  Payton v.

New York, 445 U.S. 573, 590 (1980).

The Court now turns to the validity of the warrant.  "A search based upon a warrant is

presumed to be valid once the State establishes that the search warrant was issued in accordance

with the procedures prescribed by the rules governing search warrants."  State of New Jersey v.

Valencia, 93 N.J. 126, 133 (1983).  Here, a warrant was not properly issued pursuant to the New

Jersey Court Rules 3:2-3 and 3:3-1(a).  These rules set forth the procedure required to procure

and execute a warrant.  As to telephonic warrants, the rule specifically provided that: "A judge

may issue an arrest warrant on sworn oral testimony of a law enforcement applicant who is not

physically present.  Such sworn oral testimony may be communicated by the applicant to the

judge by telephone, radio or other means of electronic communication."  N.J. Ct. Rule 3:2-3(b).

However, the rule clearly required that the judge "shall administer the oath to the applicant."[4]

---

[4]        By Order of the New Jersey Supreme Court dated March 20, 2002, and attached
memorandum entitled "Bergen and Hudson Vicinages – Supplemental Arrest Warrant
Procedures," the Rules Governing the Court of New Jersey were relaxed in certain vicinages,
including the locale of the arrest.  It is unclear to this Court how this Order and attached
memorandum dated March 2002, applies to an arrest occurring in May of 2001.  Nonetheless,
the procedures set forth therein were not much different that the ones contained in N.J. Ct. Rule
3:2-3.  Notably, the applicant was still required to be placed under oath, which, as discussed
below, was not done in this case.

Id.  Additionally, the rule mandated that the applicant read to the judicial officer, the complaint and any supplemental materials establishing probable cause "verbatim."  Id.  Once the judicial officer was satisfied that probable cause existed, the basis for the probable cause determination was to be memorialized.  N.J. Ct. Rule 3:2-3(b).  Thereafter, the applicant should have been directed to "print his or her name, the date and time of the warrant, followed by the phrase "By Officer___, per telephonic authorization by___" on the warrant.  Id.

In the matter at bar, the Court cannot say that the noncompliance with the warrant procedures was insubstantial.  Here, the warrant made no reference to a judicial officer, nor was there any indication on its face that it had been authorized telephonically.  Further, a review of the transcript reveals that Judge McGill's "authorization" to arrest Plaintiff was not entered verbatim on the warrant.  Finally, and perhaps most significantly, Sgt. Sullivan's entire conversation with Judge McGill was unsworn, as it is clear that he was not placed under oath at any time during his conversation with Judge McGill.  In light of the foregoing, this Court concludes that the warrant was invalid.[5]  As observed by the New Jersey Supreme Court,

_____

[5]      In their reply brief, Defendants assert for the first time that the warrantless arrest of Plaintiff was justified by exigent circumstances.  (Reply Br. at 10).  Arguments raised in the reply brief in the first instance will not be considered.  Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp. 447, 458 (D.N.J. 1998); see also Bayer AG v. Schein Pharm., Inc., 129 F. Supp. 2d 705 (D.N.J. 2001).  Accordingly, Defendants' reply brief will be stricken insofar as is raises arguments that exigent circumstances existed to justify the warrantless arrest of Plaintiff.
However, even on the merits, it is doubtful that exigent circumstances existed.  Circumstances have been determined to be exigent when they "preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both."  State v. Smith, 129 N.J. Super. 430, 435 (App.Div.), certif. denied, 66 N.J. 327 (1974).  Here, Sgt. Sullivan's statements to Judge McGill reveal that Plaintiff was not considered an immediate threat.  He stated: "if we ran across [Plaintiff] tonight or had a problem with [Plaintiff] tonight we were going to make [an arrest.]"  (Defs.' Ex.1T at 6:1-6).  Moreover, after the interview at the police station, complainant was sent back to her home - the same location where Plaintiff still resided.  As such, Defendants' argument on this point fails.

"[c]ourts in this State consistently have maintained that strict adherence to the protective rules governing search warrants is an integral part of the constitutional armory safeguarding citizens from unreasonable searches and seizures." <u>Valencia</u>, 93 N.J. at 134 (citations omitted).  Thus, Defendants' motion will be denied inasmuch as that they move for summary judgment on the issue of whether the warrant was proper.[6]

### 3.      Qualified Immunity

Qualified immunity shields state officials performing discretionary functions from suit for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  The United States Supreme Court has emphasized the importance of resolving immunity questions at the earliest possible stage in litigation because "[t]he entitlement is an immunity from suit rather than a mere defense to liability."  <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985)).  "[I]n § 1983 cases involving alleged violations of the Fourth Amendment, ... the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession."  <u>Sharrar</u>, 128 F.3d at 827 (citing <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam)).  In evaluating qualified immunity claims, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation."  <u>Conn v. Gabbert</u>,

---

[6]      The New Jersey rules further required that the judge be satisfied that probable cause exists for issuance.  N.J. Ct. Rules 3:2-3(b) and 3:3-1(1). The record is not clear as to whether Judge McGill knew he was authorizing the issuance of an arrest warrant.  Nonetheless, the Court need not reach the issue, as a determination has already been made that the warrant was invalid.

526 U.S. 286, 290 (1999); Wilson v. Russo, 212 F.3d 781 (3d Cir. 2000).  If a clearly established

right has been violated, it must then be considered whether in light of the circumstances known

to the officer at the time, a reasonable officer would have known that his conduct violated the

right.  If a reasonable officer would have so known, then an officer is not entitled to immunity

for such actions.  Harlow, 457 U.S. at 813-20; Bartholomew v. Commonwealth of Pennsylvania,

221 F.3d 425, 428 (3d Cir. 2000); Nannay v. Rowan College, 101 F. Supp. 2d 272  (D.N.J.

2000).  When the alleged constitutional violation relates to an arrest pursuant to a warrant,

"[o]nly where the warrant application is 'so lacking in indicia of probable cause as to render

official belief in its existence unreasonable[]' will the officer lose the shield of immunity."

Orsatti, 71 F.3d at 483 (quoting Malley, 475 U.S. at 341).

In determining whether a government official is entitled to immunity, both the existence

of a clearly established right and the objective reasonableness of the officer's actions are

questions of law for the Court to decide.  Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002).

Where "historical facts" material to the issue of whether the actions of the officers were

objectively reasonable exist, it will be an issue for the jury.  Sharrar, 128 F.3d at 828.

### (a)     *Patrol Officers*

Defendants argue that since probable cause was established by the superior officers,

Costanza's and Bacigalupo's actions were objectively reasonable, and accordingly, they are

immune from liability.  Plaintiff maintains that there is no qualified immunity because these

officers knew that the warrant issued required the signature of a judicial officer prior to

execution, and hence, they knowingly executed a defective arrest warrant.  There is no question

that the right to be free from arrest within one's home unaccompanied by a valid warrant, was

clearly established at the time of Plaintiff's arrest.  Payton, 445 U.S. at 590 ("[T]he Fourth

Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").  Thus, the Court must now determine whether the actions of these Defendants were objectively reasonable in light of clearly established law.

Based on the record before this Court, it is unclear what was written on the warrant when Lt. Rinn gave it to the patrol officers to execute, and no evidence has been offered regarding the substance of what the patrol officers were told concerning the issuance of the warrant.  Further, it is not apparent whether, at the time these Defendants executed the warrant, the word "is" was or was not circled on the warrant relative to a finding of probable cause.[7]  Nonetheless, one thing is certain, there was no signature of a judicial officer at the time.  This alone may have been of no moment.  However, here, the warrant in question did not even contain the name of the judicial officer who found the probable cause, or the date and time.  Further, Lt. Rinn's signature appeared over the line marked "Name and Title of Person Administering the Oath," and there is no indication whatsoever that the warrant had been authorized telephonically.  Given all of the above, this Court finds that the warrant executed by Costanza and Bacigalupo lacked any indicia that it was validly authorized by a judicial officer either directly or through the telephonic warrant process.  Given how clearly established the law regarding arrest in a person's home was at the time of the arrest, it cannot be said that there was an objectively reasonable belief that there was a valid warrant at the time of Plaintiff's arrest when the officers clearly knew that the warrant did not contain either the name of the judicial officer, his signature or an indication that it had been validly attained through the telephonic process.  Accordingly, under these facts, this

---

[7]      The warrant provides: "Probable cause is / is not found for the issuance of this complaint."  (Defs.' Ex. JA-JZ).

Court concludes that as a matter of law, the patrol officers' actions were not reasonable, and therefore, the Court declines to extend qualified immunity these officers.

### (b)      *Superior Officers*

To the extent Defendants seek qualified immunity for Lt. Rinn based on Lt. Rinn's application for the warrant, that determination remains a question of fact for the jury, because, as discussed, <u>supra</u>, there are material issues of fact relating to the issue of probable cause. However, the Court must also examine Lt. Rinn's actions as they relate to the issuance and the execution of the warrant.  With respect to the issuance of the warrant, a reasonable, competent officer would have known that an arrest warrant would have required a judicial signature, or for telephonic warrant, an indication that the judicial officer found probable cause and authorized the warrant.  Moreover, Lt. Rinn should have known that the warrant failed on several other grounds as well.  For instance, Sgt. Sullivan's name, as the warrant applicant on whose testimony the probable cause finding was based, as well as the date and time of the probable cause finding were also missing from the warrant.  A reasonably competent officer in Lt. Rinn's position would not have issued a warrant or asked other officers to execute an arrest warrant under these circumstances.  Therefore, the Court concludes that these actions were unreasonable as a matter of law.  Thus, Lt. Rinn is not immune, and accordingly, summary judgment will be denied.

With respect to qualified immunity for Sgt. Sullivan, Plaintiff contends that Sgt. Sullivan misrepresented Judge McGill's finding of probable cause, as he stated "we definitely had probable cause" and that the judge directed that the warrant should issue.  (Defs.' Ex.4T at 52:11-16).  Plaintiff also asserts that Sgt. Sullivan misrepresented to Judge McGill that he was present when the alleged terroristic threats were made.  (Defs.' Ex.1T at 4:9-18).  On the call

with Judge McGill, Sgt. Sullivan knew he was not placed under oath, as the rules clearly indicate he should have been. Further, he did not include Judge McGill's authorization verbatim on the warrant. And finally, he did not include his own name on the warrant and further indicate that the warrant was authorized by Judge McGill. These actions cannot be deemed reasonable as a matter of law. As such, summary judgment on the issue of qualified immunity will also be denied as to this Defendant.

### C.    Liability for City of Jersey City and City of Jersey City Police Department

### 1.    Immunity

For a municipality to be held liable for damages under § 1983, the plaintiff must demonstrate that the municipality itself has a policy or custom that resulted in a violation of the plaintiff's constitutional rights; a municipality cannot be held liable under a theory of respondeat superior. Monell v. Dep't of Soc. Servs.of N.Y., 436 U.S. 658, 690-91 (1978). A custom can be established by showing a course of conduct that is "permanent and well settled." Id. at 691. Once established, the plaintiff is required to show that the municipality's custom caused his injury. Berg v. Allegheny County, 219 F.3d 261, 276 (3d Cir. 2000) (citing Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997)).

A custom may be established by providing evidence that the municipality failed to adequately train its officers, but only where the plaintiff can show that the failure to train was a deliberate choice made by the municipality. Brown v. Muhlenberg Twp., 269 F.3d 205, 215 (3d Cir. 2001). The Supreme Court explained the deliberate choice requirement as follows:

> It may seem contrary to common sense to assert that a
> municipality will actually have a policy of not taking reasonable
> steps to train its employees. But it may happen that in light of the
> duties assigned to specific officers or employees the need for more
> or different training is so obvious, and the inadequacy so likely to

> result in the violation of constitutional rights, that the
> policymakers of the city can reasonably be said to have been
> deliberately indifferent to the need.

Id. (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).  Typically, a plaintiff is

required to show that the failure to train has caused a pattern of violations, not just the incident in

question.  Berg, 219 F.3d at 276 (citing Bryan, 520 U.S. at 409).  However, such a showing is

not always necessary, but, when absent, the burden on the plaintiff will be higher.  Id.

In Berg, police officers arrested the wrong person due to a clerical error in preparing the

warrant.  No evidence presented showed that the municipality's process for issuing warrants

contained any measure to double check whether an erroneous warrant was issued.  Id. at 276-77.

The court, in reversing a grant of summary judgment in favor of the municipality, held that

"when such a simple mistake can so obviously lead to a constitutional violation, we cannot hold

that the municipality was not deliberately indifferent to the risk as a matter of law."  Id. at 277.

Another "example of deliberate indifference to an obvious risk is arming officers without

training them 'in the constitutional limitations on the use [of the arms.]'"  Id. at 276 (citing

Canton, 489 U.S. at 390 n.10).

The arrest of Plaintiff in this case was the direct result of officers issuing and executing

an arrest warrant despite the failure to follow the proper procedures.  The warrant itself did not

contain the basic information required to evince that an appropriate judicial officer had made a

finding of probable cause and authorized the warrant.  This mistake, like the mistake in Berg,

was simple.  In Berg, the mistake was easily made.  Here, it was easily prevented by ensuring

that the officers knew what was required for a valid warrant and instructing them to only execute

the warrant after verifying that it contained the required information.  The issue, then, is whether

the officers' mistake in this case was a result of the JC and JCPD's deliberate indifference to the

need for adequate training or merely a mistake on the part of the officers involved.

Defendants argue that even if the supervising and patrol officers made a mistake in arresting Plaintiff, the mistake was an isolated incident involving these officers and not representative of a failure to train rising to the level of deliberate indifference by the JC and JCPD.  The Defendants' position may be bolstered by the June 25, 1995 memo that recognized past problems of arrests without sufficient probable cause and outlined specific measures designed to address the issue.  The position is also bolstered by Lt. Rinn's continuation report noting that she was informed by Internal Affairs that there were inconsistencies and omissions in the warrant complaint.  (Defs.'Ex. JA-JZ).  This evidence could support a finding that the "policy" of the JC and JCPD was not the cause of Plaintiff's injury; rather, the cause was that the officers simply did not follow policy.

On the other hand, Plaintiff asserts that the failure of the officers in his case to adhere to the statutory requirements for arrest warrants was not merely an isolated incident, but rather represented a widespread practice resulting from a failure of the JC and JCPD to adequately train its officers.  In support of his position, Plaintiff points to the depositions of Lt. Rinn and Sgt. Sullivan.  Both superior officers stated that they received training on warrant procedures, and that based on their training they believed the procedures they followed in procuring, issuing, and executing Plaintiff's arrest warrant were proper. (Defs.' Ex.3T at 26:16 to27:13, 44:16 to 46:8; 4T 13:18 to 20:24, 34:2-12).  Additionally, Sgt. Sullivan states that, despite his training, he was unaware of any requirement that a witness's statement be made under oath for the purpose of issuing an arrest warrant.  (Defs.' Ex.3T at 53:7 to 54:1).  No evidence has been submitted detailing what the officers actually were taught in training.  Additionally, while the June 25, 1995 memo could be read as implementing a policy designed to avoid the types of constitutional

violations asserted in this case, it also suggests knowledge at the highest levels[8] of numerous prior incidents of arrests being made without the proper finding of probable cause.  Furthermore, while the memo outlined specific requirements, the failure of the officers in this case to adhere to those requirements could support a finding that the JC and JCPD had not adequately trained officers in light of the knowledge of the past violations.  Plaintiff's position that the error was a result of deliberate indifference by the JC and JCPD is also bolstered by Defendants' own statements in their brief that the warrant was facially valid even though it was missing information that was clearly required by the June 26, 1995 memo and the relevant New Jersey statutes, N.J. Court Rules, 1969 R. 3:2-3 and R. 3:3-1(a).  (Reply Br. at 8-9).

This evidence, viewed in a light most favorable to Plaintiff, the non-moving party, creates a genuine issue of material fact as to whether the JC and JCPD were deliberately indifferent to the risk that erroneous arrests could be made due to a failure to adequately train its officers on proper arrest warrant procedures, or whether the actions of the officers were a result of their own negligence, which would not constitute a basis for JC and JCPD liability under § 1983.  Thus, summary judgment on this issue is denied.

### 2. Vicarious Liability

As discussed above, a municipality cannot be held liable unless the injury results as a result of its own action, not the actions of its employees.  Therefore, as a matter of law, in a claim under § 1983, the municipality cannot be held liable under a theory of vicarious liability. Beck v. City of Pitt., 89 F.3d 966, 971 (3d Cir. 1996).

---

[8]    The memo, from the Assignment Judge to all Hudson County Superior Court Judges, was copied to the County Police Chief and various other city officials. (Defs.' Ex.JA-JZ).

### 3.      Punitive Damages

It is well settled that punitive damages are not permitted against a municipality unless expressly authorized by statute.  Newport v. Facts Concerts, 453 U.S. 247, 261 (1981).  The Court has affirmed its holding in subsequent decisions, including the notation in Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 786 n.15 (2000), that "[a] better reading of Newport is that we were concerned with imposing punitive damages on taxpayers under any circumstances."  See also Smith v. Wade, 461 U.S. 30, 35 n.5 (1983). This Circuit observed that City of Newport "stands for the proposition that municipalities, and more broadly, state and local governments are immune from punitive damages under [42 U.S.C. § 1983]."  Doe v. County of Centre, 242 F.3d 437, 455 (3d Cir. 2001).

Hence, Plaintiff's claims for punitive damages shall be dismissed.

### CONCLUSION

For the reasons set forth above, Defendants' motion is GRANTED in part, and DENIED in part. An appropriate order follows.


                                                            /s/ Jose L. Linares
DATED: September 30, 2005                   UNITED STATES DISTRICT JUDGE